**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

                                                            **05-CR-322 (NAM)**

**v.**



**(4) DENNIS JONES, a/k/a Danny Man;**
**(5) ISMAIL PIERCE, a/k/a Bird; Rocket; Holiday;**
**(6) JERRAWN THOMAS, a/k/a Piper; Jerrod;**
**(9) WILLIAM ROBINSON, a/k/a Google; Gugu; Googs; and**
**(13) GREGORY THOMAS, a/k/a Little Earl,**

                         **Defendants.**
_____

**APPEARANCES:**                                    **OF COUNSEL:**

Hinman, Howard & Kattell, LLP              Albert J. Millus, Jr., Esq.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250
_For Dennis Jones_

Office of David M. Giglio                       David M. Giglio, Esq.
231 Elizabeth Street
Utica, NY 13501
_For Ismail Pierce_

Craig P. Schlanger                              Craig P. Schlanger, Esq.
201 East Jefferson Street
Suite 350
Syracuse, NY 13202-2587
_For Jerrawn Thomas_

Aswad & Ingraham                                Thomas R. Cline, Esq.
46 Front Street
Binghamton, NY 13905
_For William Robinson_

James E. Long                                      James E. Long, Esq.
668 Central Avenue
Albany, NY 12206
*For Gregory Thomas*

Glenn T. Suddaby                                   John G. Duncan,
United States Attorney                             Assistant United States Attorney
P.O. Box 7198                                      John M. Katko,
100 South Clinton Street                           Assistant United States Attorney
Syracuse, NY 13261-7198

**Hon. Norman A. Mordue, Chief Judge:**

## MEMORANDUM DECISION AND ORDER

## I.   INTRODUCTION

The one-count Third Superseding Indictment charged defendants Dennis Jones, Ismail Pierce, Jerrawn Thomas, William Robinson, and Gregory Thomas with conspiring to conduct and participate, directly and indirectly, in the conduct of the affairs of the Elk Block enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act, ("RICO") 18 U.S.C. § 1962(d).  On December 19, 2006, after more than four weeks of trial, and having deliberated over parts of two days, the jury found defendants guilty. The jury further found that each defendant agreed to a pattern of racketeering activity that included conspiracy to distribute and/or possession with intent to distribute 50 grams or more of cocaine base (crack).  Presently before the Court are defendants' motions for judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  Alternatively, defendants move for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

## II.   FACTUAL BACKGROUND

The facts of this case, according to the government, arose from defendants' involvement in the Elk Block gang.  The government alleged that defendants belonged to Elk Block, a gang that

congregated and operated in a territory in Syracuse, New York bordered by South Salina Street on the west, Interstate 81 on the east, Colvin Street on the north, and McAllister Avenue on the south. Indicted co-conspirators and former Elk Block gang members testified at trial regarding Elk Block's geographic territory, gang signs, graffiti, clothing, tattoos, drug dealing, use of firearms, and utilization of violence for the protection and maintenance of control over the cocaine base (crack) sales in Elk Block territory.  At trial, there was evidence of a multitude of shootings and several murders.

### III.    Defendants' Motion for Judgment of Acquittal

Defendants assert that the evidence at trial was legally insufficient to sustain the guilty verdicts because: (1) Elk Block did not have an organization or framework for making or carrying out decisions or any common purpose; (2) the government failed to establish that at least one Elk Block member participated in the operation, management, or direction of the affairs of the enterprise; and (3) there was no evidence that Elk Block existed separately from the pattern of racketeering activity.

In deciding a motion for judgment of acquittal, the Court must view the evidence presented in the light most favorable to the government and draw all reasonable inferences in its favor.  *See United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991).  "[T]he court must be careful to avoid usurping the role of the jury" by substituting its own determinations of credibility or relative weight of the evidence.  *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir. 1999).  A court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."  *United States v. Mariani,* 725 F.2d 862, 865 (2d

Cir. 1984) (quoting *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir. 1972)) (internal quotation marks omitted).  "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'"  *Guadagna,* 183 F.3d at 129 (quoting *Curley v. United States,* 160 F.2d 229, 233 (D.C.Cir. 1947)) (first alteration added).

With these principles in mind, the Court must uphold the jury's verdict in this case if it finds that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  A defendant shoulders a "heavy burden" in challenging the sufficiency of evidence supporting a conviction, *United States v. Matthews,* 20 F.3d 538, 548 (2d Cir. 1994), and the Court finds that defendants have failed to meet it in the instant matter.  The Court notes that defense counsel made the arguments referenced herein along with others equally compelling to the jury in connection with attempting to cast doubt over whether Elk Block had a framework, any Elk Block member operated, managed, or directed Elk Block's affairs, and whether defendants agreed to a scheme relating to Elk Block as a criminal enterprise.  It is, however, the function of the jury to determine the credibility of witnesses, weigh evidence, and draw "justifiable inferences of fact from proven facts." *Curley,* 160 F.2d at 233. The Court is confident that the jury did so in this case and that the evidence presented by the government was sufficient to establish defendants' guilt beyond a reasonable doubt.

A.      **Elk Block as a RICO Enterprise**

The gravamen of defendants' arguments is that the government failed to present sufficient evidence that Elk Block was a RICO enterprise.  "To establish the existence of a RICO conspiracy, the government was required to prove only the existence of an agreement to violate RICO's

substantive provisions.  Thus, the government necessarily had to establish that [the defendant] agreed with his criminal associates to form the RICO enterprise . . . ."  *United States v. Benevento*, 836 F.2d 60, 73 (2d Cir. 1987).  RICO defines "enterprise" as, *inter alia*, "any . . . group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  A RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  The Second Circuit has suggested that "the existence of an association-in-fact is oftentimes more readily proven by 'what it *does*, rather than by abstract analysis of its structure.'"  *United States v. Coonan,* 938 F.2d 1553, 1559 (2d Cir. 1991) (quoting *United States v. Bagaric*, 706 F.2d 42, 56 (2d Cir. 1983) (emphasis in original)).  For this reason, the Second Circuit has indicated that "proof of various racketeering acts may be relied on to establish the existence of the charged enterprise."  *Id*. at 1560.

At trial, the government introduced evidence from which the jury could have found that the Elk Block gang had a hierarchy and an informal organization, and that it functioned as a continuing unit.  For example, there was evidence that among the Elk Block gang members there were senior members who supplied crack to the lower level members to sell at the street level, but that a lower level member could "graduate" by "selling weight", *e.g.*, more drugs.  There was also evidence that Elk Block members had a meeting place at the end of McKinley Ave., which was at the top of a hill providing them with a view of anyone who might approach, where they congregated to, *inter alia*, discuss with and update gang members on gang related matters such as fights or "beefs" with rival gangs and how to retaliate against members of other gangs.  Finally, there was evidence that the Elk Block gang functioned over the course of its existence to "sell

drugs, protect our territory, and protect each other".

James Kelly, an indicted co-conspirator and member of the Elk Block gang, testified regarding the history of the gang.  Kelly stated that between 1994 and 1998, he, Billy Pringle, and others sold cocaine base (crack) in the McKinley Avenue area and called themselves the "Ave Boys" after McKinley Avenue.  Kelly testified that although he did not live in the area at the time, he sold drugs there because he "grew up" there and it was "home base".  Kelly testified that defendant Jones sold crack in the area with the Ave Boys during that time, and that defendants Pierce, Gregory Thomas, Robinson, and Jerrawn Thomas spent time there and called themselves "Juveniles Wilding".  Kelly stated that Juveniles Wilding was "another name for Ave. Boys" and explained that its members were younger than the Ave. Boys and were juveniles that got into "fistfights" and stole bikes but did not sell drugs at that point.

Kelly testified that in 1998 he, defendants, and others "switched" and "started calling ourself Elk Block" because they were "hanging around Elk Street [and] started selling drugs on Elk Street".  According to Kelly, "it was easy" for defendants Pierce, Gregory Thomas, Robinson, and Jerrawn Thomas to "become Elk Block" because they lived in the area.  Kelly testified that as part of their Elk Block membership, defendants sold drugs in Elk Block territory.

Kelly testified that in 1998, Billy Pringle and Israel Applins, also an Elk Block gang member, were the "main supplier[s]" of crack to Elk Block gang members.  Kelly stated that he was a low level drug dealer at that time but that he saved up $5,000 from his drug sales hoping to move up.  Kelly testified that he brought the money to Pringle, and Pringle "pulled [him] in".  As a result, Kelly "graduated" from low level drug dealer to become "one of the big men's", supplying "gang members and outside people drugs."  From that point on, Kelly testified, he obtained drugs

from Pringle and started selling to Elk Block gang members, including defendants.  Kelly described himself as a "senior member" of the Elk Block gang and testified that gang members "graduated" within the gang when they start "selling weight".  Kelly testified that, Pierce, for example, became a "senior member" when he began to "sell[] weight".

Pringle testified that Elk Block gang members would meet at the "top of McKinley" because "it's a dead end . . . it's a one-way so if any vehicles coming, got to come up the street so we see them, so that's where we congregate at."  Pringle and Speights testified that Elk Block gang members met there after altercations with members from other gangs to discuss what had happened and what they could do to retaliate.

Nathan Speights, an indicted co-conspirator and Elk Block gang member testified that Elk Block's function or purpose "was just basically sell drugs, protect our territory, and protect each other, that's it."  Regarding Elk Block's drug sales, Pringle testified that Kelly and Israel Applins pooled money that "was coming up through various sales in the [Elk Block] neighborhood from other gang members," and that he put his money with their money, and they would take this money, typically, $20,000 to $30,000, to purchase more cocaine from a source in New York City. Pringle testified that they would buy a kilogram or more of cocaine per trip and that he made at least twenty trips to New York City.  Pringle stated that Israel Applins and Kelly made at least twenty trips to New York City on his behalf.  Pringle testified that he would cook the cocaine into crack, passed it on to Israel Applins and Kelly and they would "in turn supply the gang with it."

Pringle testified that each of the five defendants frequently sold crack cocaine in Elk Block territory.  Pringle stated that Elk Block members would hang out in the territory and when a "crackhead" wanted some drugs a gang member would sell him or her a piece of crack.  Pringle

explained that if there were a number of gang members "out there and everybody want to get their crack off, they would rotate the sale.  If some person got more than others, they might get more sales at that time than others.  We kind of like just worked it out among ourselves."

There was also evidence that only Elk Block gang members could sell drugs in Elk Block territory.  Pringle testified that Elk Block gang members would control the drug sales in the territory through violence, stating that "if anybody came to the neighborhood trying to sell drugs, they would be met with violence, if it was a fist fight or whatever, shootins, or whatever it may be."  Pringle further stated that "people knew not to come over there" to sell drugs.

Speights testified that in 2000, he learned that two individuals who were members of the Bloods gang were selling drugs in Elk Block territory and that an Elk Block gang member confronted them and got into an altercation with them.  That same day, Speights and Gregory Thomas saw "a guy driving around our neighborhood", so they ran through a "shortcut" on McKinley and "shot at their car."  Speights testified that Elk Block members did not sell in other gangs' territories and that other gangs did not sell in Elk Block territory.

Speights testified that even though he lived outside the Elk Block area in 2002, he dealt drugs in Elk Block territory because "that's the area I'm from . . . that's where I'm safe selling my drugs.  That's where I know I'm going to make my money and nothing going to happen."  Speights further explained he felt safe because:

> If I'm out there late at night, anybody try to come through, there is going to be a gun around me, there is going to be a gun around that I can have access to quick or I'm already going to have it on me, or there is going to be [other Elk Block members] out there with me, and if somebody come through trying to rob me or anything, like I know I'm all right.

There was also evidence that in furtherance of their efforts to maintain a unified front, Elk

8

Block gang members marked their territory with graffiti, got tattoos signifying their membership in the gang, and flashed an Elk Block hand sign in public places to "represent" that they were members of Elk Block.  Pringle stated that he paid attorneys' fees for several Elk Block gang members when they were arrested because "we look out for one another with crack proceeds".

There was evidence at trial that beginning in 1999, after Jeffrey Connors, a Boot Camp gang member, stole crack cocaine from Pringle during a drug sale and then shot at Pringle from the trunk of a vehicle, tension between the Elk Block and Boot Camp gangs escalated.  Pringle testified that after that incident, he arranged to buy a number of firearms from Georgia using crack proceeds from the neighborhood because the gang needed "fire power".  According to Ronnie Parnell, an indicted co-conspirator and Elk Block gang member, at that point, even if an Elk Block gang member did not have a gun, he would have access to a gun if necessary because Elk Block was "beefin' with Boot Camp."

On April 14, 2000, Jerrawn Thomas shot and killed Connors after Connors entered Elk Block territory to confront Elk Block members about an altercation some Elk Block members had with his cousin earlier that day.  Speights stated that on the day of the Connors shooting, he knew there might be trouble when Connors arrived but did not leave Elk Block territory because "That's our block.  If we leave, people going to think we scared . . . .  We're holding down our block . . . . We made that block and if anybody come there, we're going to protect our block."  Speights testified that there was no such thing as a "one on one" beef, or rivalry, with another gang because "you got a problem with one person, you got a problem with everybody.  We take it it's like one for all, all for one.  Like, if I got a problem . . . it's everybody on Elk Block problem, everybody gonna step up for my problem.  If Denn[is Jones] got a problem with somebody, everybody got a

problem with everybody from Elk Block, not just [Jones]."

There was also evidence that Elk Block members had an expectation that all members would participate in gang activities.  For example, Pringle testified that Speights and other gang members were "upset" when Jones did not get involved an the altercation Elk Block gang members had with Boot Camp gang members at a local bar.

Speights testified that on April 13, 2003, a fight broke out between Elk Block gang members and Boot Camp gang members at the Komfort Zone bar.  There was evidence at trial that Jerrawn Thomas's presence at the Komfort Zone that night provoked the fight because he had been released from prison recently after serving time for possessing a firearm in connection with the Connors shooting.

Speights stated that after the fight, the Elk Block gang members who were there started calling other Elk Block gang members to let them know what happened and that they were "about to handle what we got to handle".  As a result, Elk Block gang members met at the top of McKinley "and talk about a lot of stuff", including what they were going to do.  According to Speights, Pierce indicated that he was going to the Bricks "and do a shooting".  Next, Speights, Jerrawn Thomas, and Robinson got into Speights's car to look for "anybody that was at that fight, that was with Boot Camp or the Bricks or anybody that . . . was affiliated with them".  Speights testified that Jerrawn Thomas and Robinson had guns with them in the car, and they drove to the Bricks and went to "Frisbie Court" where there was a crowd of people.  Speights stated that Jerrawn Thomas and Robinson got out of the car and started shooting toward a crowd of people.  Speights testified that the next day, he Robinson, Pierce, and Jerrawn Thomas met at Robinson's house and talked about the night before.  According to Speights, they talked about being "on

10

again", explaining, "like anywhere we see anybody from Boot Camp, Brick Town, anybody, we just gonna give it to them, like handle them wherever we see them at."

Based on the above, the Court concludes that the jury had ample evidence from which it could find that: Elk Block members had an organization and a hierarchy, even if informal; and that they functioned as a continuing unit in order to project a unified image to members of other gangs through the use of gang signs, graffiti, tattoos, and violence, protect each other, and maintain Elk Block territory for their own drug sales.

Finally, there is not merit to defendants' assertions that the government failed to prove that Elk Block existed separately from the predicate acts of racketeering. While the government relied on evidence of various racketeering acts, "RICO charges may be proven even when the enterprise and predicate acts are functionally equivalent, and the proof used to establish them coalesced". *United States v. Ferguson*, 758 F.2d 843, 853 (2d Cir. 1985) (internal quotations and alterations omitted). Moreover, there was sufficient evidence from which the jury could find that Elk Block existed apart from its acts of racketeering. The government adduced evidence of Elk Bock's formation, hierarchy, and continuing efforts to maintain Elk Block territory for members' crack cocaine sales.

**B.      Defendants Agreement to a RICO conspiracy**

Defendants assert that the government failed to present sufficient evidence from which the jury could find that they agreed to a RICO conspiracy. In *Salinas v. United States*, the Supreme Court stated that under the RICO conspiracy statute:

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's

11

completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.

522 U.S. 52, 65 (1997).  The relevant inquiry is whether the defendant "agreed with his criminal associates to form the RICO enterprise".  *Benevento*, 836 F.2d at 73.

Defendant Dennis Jones asserts that there was no evidence that he was "employed by or associated with" the Elk Block enterprise or that he agreed to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  To be convicted as a conspirator, however, "one must be shown to have possessed knowledge of only the general contours of the conspiracy."  *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000).  Further, Pringle testified that by 1999, he "witnessed [Jones] in the area doing drug transactions and being part of the gang".  Pringle stated that Jones sold drugs in Elk Block territory on a "regular basis" when he was not in jail.  Pringle testified that although Jones did not live in the area in the time, he was able to sell there because "[h]e was part of the gang" and had a family connection.  Kelly testified that he sold crack to Jones "practically every day" and that he observed Jones selling crack on the street.  Parnell testified that in 2000, after the violence began to escalate between gangs, he saw all five defendants, including defendant Jones, carrying guns.  There was also evidence that Jones wore an Elk Block tattoo that said "The Elk Block Finest", displayed the Elk Block gang hand sign, and was present when Elk Block gang members were engaged in altercations with rival Boot Camp gang members.  Thus, the government presented evidence which suffices to support the jury's finding that defendant Jones was aware of and agreed to the RICO conspiracy in this case.

Defendant Ismail Pierce argues that there was insufficient evidence at trial to establish that he agreed that two predicate acts would be committed.  The government presented overwhelming

evidence from which the jury could rely on to find that defendant Pierce agreed to the alleged RICO conspiracy.  Kelly testified that he sold crack to defendant Pierce and that defendant Pierce sold crack to customers on the streets in Elk Block territory on a daily basis.  There was also evidence that defendant Pierce fired shots at Rodney Hill, a Boot Camp gang member, during an altercation between Elk Block and Boot Camp gang members at the Komfort Zone bar.  Moreover, the government introduced rap lyrics Pierce wrote which show his knowledge of the Elk Block gang and the gang violence.

In addition to evidence that Jerrawn Thomas sold crack cocaine in Elk Block territory on a regular basis, as discussed above, there was evidence at trial that Thomas shot and killed Jeffrey Connors, a Boot Camp gang member, in a gang related incident.  The government also presented evidence that defendant Jerrawn Thomas shot into a crowd at Frisbie Court in an attempt to retaliate against Boot Camp gang members following a gang altercation at the Komfort Zone.

Defendant William Robinson argues that there was insufficient evidence at trial that he agreed to any conspiracy. The government also adduced ample evidence from which the jury could find that Robinson agreed to the alleged conspiracy.  For instance, co-conspirators testified that Robinson regularly sold crack cocaine in Elk Block territory and carried a gun.  The government adduced evidence that defendant Robinson attempted to retaliate against the Boot Camp gang following the altercation at the Komfort Zone, by shooting numerous shots into a crowd gathered in Frisbee Court.  There was also evidence that members of rival gangs shot defendant Robinson on at least two occasions.  Thus, there was sufficient evidence introduced at trial from which the jury could find that defendant Robinson knew and agreed to the alleged RICO conspiracy.

There was evidence at trial that Gregory Thomas engaged in daily crack cocaine sales in

13

Elk Block territory, that Pringle "fronted" Thomas crack cocaine after Thomas was released from prison to help Thomas get back on his feet.  Indicted co-conspirator and Elk Block gang member Ronnie Parnell testified that in 2000, when violence started to escalate between Elk Block and other gangs in the area, each defendant, including Gregory Thomas secured and carried a gun. Parnell further testified that in 2000, after Gregory Thomas was shot by a member of the Freestyle gang, he spoke to Parnell about retaliating and shooting someone from Freestyle.  Thus, there was ample evidence from which the jury could conclude that defendant Gregory Thomas agreed to the alleged RICO conspiracy.

  **C.**  **Single Conspiracy**

  Defendant Dennis Jones briefly argues that the evidence showed the existence of multiple conspiracies, "not the single, coherent conspiracy alleged by the Government".  The Court instructed the jury on this issue, and their verdict reflects their rejection of defendant's view of the proof.  Moreover, the Court finds, for the reasons discussed above, that the evidence the government adduced at trial provided a sufficient basis on which the jury could find that defendant committed the RICO conspiracy alleged in the indictment.

  Based on all of the above, defendants' motion for a judgment of acquittal is denied.

**IV.** **Defendants' Motions for a New Trial**

  Defendant seeks a new trial as an alternative to a judgment of acquittal arguing it a new trial is necessary to prevent a "miscarriage of justice".  Defendant Jones argues for a new trial on the grounds that: (1) the government's evidence contained gaps and deficiencies warranting a new trial; and (2) the Court erred in charging the jury that the government need only prove defendants agreed to violate § 1962(d) because the law requires that at least one overt act was committed

before a defendant can be convicted of a conspiracy charge under § 1962(d).

Defendant Pierce argues for a new trial on the grounds that: (1) the prosecutor's mention of the Efrain Andino shooting in his opening statement caused defendant surprise and undue prejudice; (2) the government's failure to provide *Brady* material in a timely manner with respect to the shooting of Charles Myles warrants a new trial; and (3) the Court erred as a matter of law by charging the jury that it did not have to find that an enterprise existed in order to convict defendant.

Defendant Jerrawn Thomas argues for a new trial on the grounds that: (1) the admission of evidence concerning the shooting of Delmar Everson unduly prejudiced him; and (2) the Court erred in instructing the jury regarding the government's obligation to prove the existence of a RICO enterprise.

Defendant William Robinson argues for a new trial on the grounds that: (1) the admission of testimony regarding the Delmar Everson homicide compromised his right to a fair trial; (2) the Court improperly admitted an SKS assault rifle into evidence; (3) the Court improperly admitted co-conspirator statements; and (4) the Court erred in instructing the jury regarding the government's obligation to prove the existence of a RICO enterprise.

Defendant Gregory Thomas argues for a new trial on the grounds that: (1) the Court erred in instructing the jury regarding the government's obligation to prove the existence of a RICO enterprise; and (2) the admission of evidence regarding the deaths of Jeffrey Connors and Delmar Everson "and evidence of other deaths and shootings" had no nexus to the Elk Block enterprise or Gregory Thomas.

Pursuant to Fed. R. Crim. P. 33, a court "may grant a new trial to [the] defendant if

required in the interest of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). Further, "the court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).  However, in *Sanchez*, the Second Circuit explained:

> It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.  Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation.  But the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial.  The test is whether "it would be a manifest injustice to let the guilty verdict stand."

*Id.* at 1414 (internal citations omitted) (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

### A.    Insufficient Evidence

By its terms, Rule 33 confers on the trial court greater discretion to grant a new trial than to grant a motion for a judgment of acquittal, but "where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly." *Id.* (internal citation omitted).  In view of this standard, defendants' motions for a new trial based on the insufficiency of the evidence must be denied.  The Court finds that defendants have failed to present "exceptional circumstances" which would warrant this Court's interference with the jury's function or actual evidence suggesting a miscarriage of justice will occur absent such intervention.  Accordingly, the Court turns to defendants' remaining arguments.

### B.    Admission of Evidence

As a general matter, all relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded.  *See* Fed.R.Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination

16

of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice". Fed. R. Evid. 403.

In this case, defendants assert the admission of evidence regarding the shooting deaths of Delmar Everson and Jeffrey Connors, rival gang members, as well as other deaths and shootings, and the admission of an SKS assault rifle was irrelevant and unfairly prejudicial. The Court previously considered and rejected defendants' arguments. The indictment in this case alleged that members of the Elk Block gang engaged in murders and attempted murders, and resorted to acts of violence to preserve the Elk Block territory for their drug trade. The government further alleged that Elk Block gang members were expected to project a violent attitude to protect their territory and to retaliate with acts of violence when rival gang members committed acts of violence against Elk Block gang members in order to ensure their stature within the Syracuse gang community.

Evidence regarding the shooting deaths of Boot Camp gang members Delmar Everson and Jeffrey Connors, while prejudicial, was relevant to the issues of defendants' participation in the Elk Block enterprise and agreement to the alleged RICO conspiracy. Moreover, in view of the testimony and evidence regarding numerous other shootings and acts of violence, together with the overwhelming evidence of defendants' involvement in regular drug sales in Elk Block territory and long time membership in the Elk Block gang, the Court does not find this evidence was unfairly prejudicial.

Defendant Robinson argues that the admission of the SKS assault rifle at trial unfairly prejudiced him because there was no indication that the firearm bore any connection to the alleged gang activities. In view of the number of firearms admitted into evidence at trial together with

17

evidence that defendant Gregory Thomas surrendered the firearm in 2000 and that each defendant, and Elk Block members generally, had access to or possessed firearms to protect themselves from rival gang members and to project an attitude of violence in order to maintain Elk Block territory for their own drug trade, the Court cannot say the probative value of the admission of this firearm was "substantially outweighed by the danger of unfair prejudice". Fed.R.Evid. 403.

### C.     Co-conspirator Statements

Defendants argue that the Court improperly admitted co-conspirator statements at trial. Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that: "[a] statement is not hearsay if - - . . . [t]he statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  The Second Circuit has instructed that:

> To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy.

*United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).   In determining whether a conspiracy existed, the district court may consider the hearsay statement itself, but " 'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.' "  *Id.* (quoting *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir.1996)).  To be in furtherance of the conspiracy, a statement may not be "mere idle chatter", *United States v. Paone*, 782 F.2d 386, 390 (2d Cir.1986), and "must be more than 'a merely narrative' description by one co-conspirator of the acts of another."  *United States v. SKW Metals & Alloys, Inc*., 195 F.3d 83, 88 (2d Cir. 1999) (quoting *United States v. Beech-Nut Nutrition Corp*., 871 F.2d 1181, 1199 (2d Cir. 1989)).

In this case, the Court admitted the co-conspirator statements "subject to connection".  The

18

Court subsequently found by a preponderance that the government adduced evidence sufficient to show that in each instance it sought to admit a co-conspirator's statement, a RICO conspiracy existed involving defendants and the declarant, and that the statement was neither "idle chatter" nor "merely narrative" but was made in furtherance of the conspiracy.  The Court further found that in some instances, even if the statement were not admissible pursuant to Rule 801(d)(2)(E), it would be admissible as a statement against penal interest, *see* Fed.R.Evid. 804(b)(3), or under the state of mind exception to the hearsay rule, *see* Fed.R.Evid. 803(3).  Indeed, even setting aside the co-conspirator statements, the evidence that each defendant conspired to engage in a pattern of racketeering activity as part of his membership in the Elk Block gang in violation of the RICO conspiracy statute was overwhelming.

### D.      Efrain Andino Shooting

Defendant Ismail Pierce argues for a new trial on the basis that in his opening statement, the prosecutor detailed Pierce's shooting rival gang member of Efrain Andino.  Defendant Pierce asserts the prosecutor's statement surprised and unfairly prejudiced him because the indictment alleged that Elk Block gang member Ronnie Parnell attempted to murder Andino.

In this case, defendant Pierce received *Jencks* material shortly before trial which contained Parnell's debriefing notes.  These notes reflect Parnell's claim that defendant Pierce shot Andino.  Approximately halfway through trial, the government supplied defendant with discovery material relating to the Andino shooting.  The parties agreed during trial that the government not elicit testimony regarding this shooting and that defense counsel would not comment in his closing statement on the government's failure to prove this shooting.  Further, the Court specifically instructed the jury that "[w]hat the lawyers have said in their opening statements, in their closing

19

arguments, in their objections, or in their questions is not evidence" and that witness testimony, exhibits received in evidence, and stipulations between the parties were evidence. "It must be assumed that the jury followed instructions." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 340 (2d Cir. 1993); *see Herring v. Meachum*, 11 F.3d 374, 378 (2d Cir. 1993) (the court must presume the jury follows instructions, unless there is an overwhelming probability that they were unable to); *United States v. Castano*, 999 F.2d 615, 618 (2d Cir. 1993) (per curiam) (same). In view of the absence of any evidence regarding the Andino shooting and the Court's instruction to the jury, the Court cannot say the verdict was prejudiced by the government's opening statement.

### E.    Charles Myles Shooting

Defendant Pierce claims that the government failed to provide impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), in a timely manner with respect to a shooting incident involving Charles Myles, a Boot Camp gang member. At trial Speights testified that on August 29, 2000, he was shot, and that sometime after the shooting, he, Pierce, and Israel Applins drove into Boot Camp territory and that after Pierce and Applins exited the vehicle, he heard shots fired. Speights stated that he later learned that Myles had been shot in his right elbow.

Defendant Pierce asserts that Speights's testimony regarding this incident caught him by surprise because there was no mention of the incident in the indictment, Speights's debriefing notes, or any pretrial discovery. At the conclusion of Speights's testimony, the parties addressed the matter with the Court. At defense counsel's request, the government conducted a search of the Syracuse Police Department records, which revealed a police report regarding the incident. The police report indicated that Myles had been shot on May 27, 2000, three months before Speights

had been shot, and that Speights had menaced Boot Camp members the night before Myles was shot.  It contained a statement from a witness that on May 26, 2000, one of Myles's friends asked Speights "what are you gonna do" Shoot us?" and that Speights responded "I ain't gonna shoot you yet . . . I'm going to shoot you when you least expect it . . . ."

As an initial matter, the government argues there was no prejudice because the report was received into evidence, it stipulated that the shooting occurred on the date contained in the report, and defendant Pierce made no application to recall Speights to the stand for re-cross examination. The Second Circuit has instructed that "*Brady* material must be disclosed in time for its effective use at trial."  *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001).  In this case, defendant moved prior to trial for disclosure of *Brady* material.  Based on the government's representation that it would make *Brady* evidence available to defense counsel, the Court denied Pierce's request. The government, however, did not provide the document to defense counsel until after trial commenced.  The Second Circuit has emphasized that "the disclosure of critical information on the eve of trial is unsafe for the prosecution", explaining:

> When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case.

*Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001).  Moreover, although defense counsel does not question the government's belief that a police report did not exist, that does not save the government from its "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Thus, the Court assumes that the disclosure during trial was insufficient.

To establish a *Brady* violation, "a defendant must show, *inter alia*, (1) that the government

failed to disclose favorable evidence, and (2) that the evidence it 'suppressed' was material."

*United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). "Evidence is favorable to the accused

if it either tends to show that the accused is not guilty or if it impeaches a government witness."

*United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002).

In this case, the police report is *Brady* material because it contradicts Speights's testimony

regarding the date of the shooting and casts Speights's behavior prior to the shooting in a different

light. The suppression of impeaching evidence, however, "does not constitute a constitutional

violation unless the evidence is 'material.'" *Id*. at 103.

> [A] showing of materiality does not require demonstration by a preponderance that
> disclosure of the suppressed evidence would have resulted ultimately in the defendant's
> acquittal (whether based on the presence of reasonable doubt or acceptance of an
> explanation for the crime that does not inculpate the defendant). [The] touchstone of
> materiality is a reasonable probability of a different result, and the adjective is
> important. The question is not whether the defendant would more likely than not have
> received a different verdict with the evidence, but whether in its absence he received
> a fair trial, understood as a trial resulting in a verdict worthy of confidence. A
> reasonable probability of a different result is accordingly shown when the
> government's evidentiary suppression undermines confidence in the outcome of trial.

*Kyles*, 514 U.S. at 434 (1995) (internal citations and quotation marks omitted).

Defendant Pierce asserts that Speights was a key witness for the prosecution and without

the police report, counsel could not conduct a full cross examination. Defendant Pierce further

argues that the police report was material because without it, the government may not have been

able to "directly implicate Pierce in an act of racketeering."

Defendant's argument fails for two reasons. First, as a matter of law, the government was

not required to prove that each defendant committed an act of racketeering. Indeed, the Supreme

Court has held that courts cannot excuse from the RICO conspiracy provision of § 1962(d), "an

22

actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense" in § 1962(c), explaining that "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.  He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion." *Salinas v. United States*, 522 U.S. 52, 65 (1997).  Second, having heard all the evidence presented at trial, the Court does not pause in concluding that given the overwhelming evidence showing defendant Pierce's involvement in the Elk Block gang, presence at gang related activities, use of a firearm, and frequent engagement in drug sales in Elk Block territory, there is no reasonable probability that the disclosure of the police report would have a resulted in a different outcome at trial. "Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *Gil*, 297 F.3d at 103.  Accordingly, defendant Pierce's motion for a new trial based on the government's failure to disclose *Brady* evidence, is denied.

### F.    Jury Charge

Finally, defendants move for a new trial on the ground that the Court erred in instructing the jury that the government was "not required to prove that the alleged enterprise was actually established", only that "if the conspiracy offense were completed as contemplated, the enterprise would be established".  A jury instruction is erroneous if it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Bok*, 156 F.3d 157, 160 (2d Cir. 1998) (internal quotation marks omitted).

Section 1962(d) states that: "It shall be unlawful for any person to conspire to violate any

of the provisions of subsection (a), (b), or (c) of this section."  In this case, defendants were charged with conspiring to violate § 1962(c), which provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  In *Salinas*, the Supreme Court held that "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor" to be convicted under § 1962(d), 522 U.S. at 64.  Thus, the Court's instruction that the jury need only find that a defendant agreed to commit a RICO offense and that if that offense "were completed as contemplated, the enterprise", an element required under § 1962(c), the substantive offense, would be established, was correct as a matter of law.  Accordingly, defendants' motions for a new trial are denied.

## V.    CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that defendant Dennis Jones's motion for a judgment of acquittal or a new trial is DENIED; and it is further

ORDERED that defendant Ismail Pierce's motion for a judgment of acquittal or a new trial is DENIED; and it is further

ORDERED that defendant Jerrawn Thomas's motion for a judgment of acquittal or a new trial is DENIED; and it is further

ORDERED that defendant William Robinson's motion for a judgment of acquittal or a new trial is DENIED; and it is further

ORDERED that defendant Gregory Thomas's motion for a judgment of acquittal or a new trial is DENIED; and it is further

IT IS SO ORDERED.

Dated:  May 11, 2007

_____
Norman A. Mordue
Chief United States District Court Judge