**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

    vs.                                        5:05-cr-322-005 (NAM)

**ISMAIL PIERCE (5)**

    **Defendant.**

---

**APPEARANCES:**                                **OF COUNSEL:**

Glenn T. Suddaby                         John M. Katko,
United States Attorney                 Assistant United States Attorney
P.O. Box 7198
100 South Clinton Street
Syracuse, NY 13261-7198

Office of David M. Giglio             David M. Giglio, Esq.
231 Elizabeth Street
Utica, NY 13501
*Attorney For Ismail Pierce*

**Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

The one-count Third Superseding Indictment charged defendant Ismail Pierce, and others, with conspiring to conduct and participate, directly and indirectly, in the conduct of the affairs of the Elk Block enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act, ("RICO") 18 U.S.C. § 1962(d). On December 19, 2006, after more than four weeks of trial, and having deliberated over parts of two days, the jury found defendant guilty. The jury further found that defendant agreed to a pattern of racketeering activity that included conspiracy to distribute and/or possession with intent to distribute 50 grams or more of cocaine base (crack).

Following the jury's verdict, defendant filed a motion for acquittal and, alternatively, for a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. In a Memorandum-Decision and Order dated May 11, 2007, the Court denied defendant's motions. Dkt. No. 489. Presently before the Court is defendant's second motion for a new trial pursuant to Rule 33[1] on the basis that the government failed to disclose material information about testifying co-conspirator Billy Pringle's involvement in a drug distribution conspiracy with Eric Thompson and Raymond Jones, both of whom Pringle referred to during trial, though neither was indicted in this case. Dkt. No. 526.

## II. BACKGROUND

The facts of this case arose from defendant's involvement in the Elk Block gang, which operated in a territory in Syracuse, New York bordered by South Salina Street on the west, Interstate 81 on the east, Colvin Street on the north, and McAllister Avenue on the south. Indicted co-conspirators and former Elk Block gang members, including Billy Pringle, testified at trial regarding Elk Block's geographic territory, gang signs, graffiti, clothing, tattoos, drug dealing, use of firearms, and utilization of violence for the protection and maintenance of control over the cocaine base (crack) sales in Elk Block territory. At trial, there was evidence of a multitude of shootings and several murders.

According to the government, prior to trial, it provided the defense with numerous documents relating to Pringle, including a debriefing report which discussed the relationship between Thompson and Pringle:

> From 2003 through 2004, PRINGLE sold cocaine with ERIC THOMPSON. THOMPSON is an older black male and a former AVE BOY. They pooled their money together and THOMPSON went to NYC to get it. On one occasion, PRINGLE

---

[1]Neither party addresses the timeliness of the instant motion.

2

> went to NYC with ERIC THOMPSON and JAMES "BOOM" KELLY. PRINGLE met the drug supplier in Manhattan called, "CARU". "CARU" was a tall Dominican male with a slim build. ERIC had met "CARU" through "HANK" HUGGINS and "RICE". PRINGLE, KELLY, and ERIC picked up a kilo on that trip. PRINGLE and KELLY each received their cut of about 10 (ten) ounces from the kilo. PRINGLE paid about $9,000 for his cut. When they returned to Syracuse, KELLY "cooked" his and THOMPSON's coke to crack. PRINGLE left his in the powder form. PRINGLE sold his weight in small grams up to ½ ounce at various bars in Syracuse. KELLY sold his on the block. THOMPSON sold his crack on the block and had other licks as well.
>
> Later on, ISRAEL APPLINS and JAMES "BOOM" KELLY met supplier "CARU" through ELK member JAMAR LOVE. JAMAR LOVE was the one who had introduced ELK BLOCK members to supplier "CARU".
>
> In March 2004, THOMPSON was arrested and PRINGLE lost a lot of money.

This debriefing report also indicated that "RAYMOND 'RAW' JONES was the 'hitter' or enforcer for the gang. RAYMOND would collect on drug debts owed."

James Kelly's debriefing report also contains references to Jones, indicates that Jones actively looked for Connors "to retaliate", and describes Jones's attempt to bribe a witness under the heading "Elk Intimidation of Witnesses".

Pringle testified over parts of two days about the gang and its activities. The following is a summary of the testimony relevant to the instant motion. Pringle stated that he, James Kelly, and Israel Applins pooled their money from Elk Block drug sales and traveled to New York City to purchase cocaine. Pringle testified that he would cook the cocaine into crack, and that Kelly and Applins would supply it to gang members to sell. Pringle described gang members' street level drug sale procedure in Elk Block territory, including gang members' rotation of sales to customers. Pringle also testified that gang members used violence to control drug sales in the Elk Block territory. Pringle stated that in an effort to look out for one another, gang members sometimes used crack proceeds to pay attorneys' fees for other members who had been arrested.

Pringle testified that the Elk Block gang had a meeting place where gang members came together after altercations with other gangs to discuss how to retaliate. Pringle stated that all of the trial defendants frequently sold crack cocaine in Elk Block territory.

> Pringle testified that when he traveled to New York City to purchase "a kilo of cocaine" he would bring $22,000 to $25,000 with him in a "sealed compartment." Pringle explained that: two of the vehicles I had electronically sealed stash boxes that can only be operated by hitting certain gadgets. . . one was up under the seat, so you had to lift the back seat up and you have to turn on the rear defroster button and at the same time you would hit the cruise control and the horn and press the passenger's side window, which was all electronic, and it will raise the trap, which was in the back like a clam shell mechanism, and you would be able to conceal narcotics in there on the way back.

T. 551-52.

During his testimony, Pringle discussed a number of individuals who were not defendants in this case, including Eric Thompson and Raymond Jones. Pringle stated that between 2003 and 2004, Thompson was a gang affiliate or "original gangsta" with whom he and James Kelly pooled their money and went to New York City to get cocaine. Pringle also stated that he met Caru, a cocaine supplier in New York City, through Thompson. Pringle testified that he "cooked" Thompson's cocaine and that Thompson sold drugs in Elk Block territory. Pringle stated he lost a large sum of money when Thompson was arrested in March 2004.

Pringle testified that Jones was his uncle, that Jones was "in the gang", and that Jones referred Pringle to an individual, "Just", whom Pringle later hired to shoot rival gang member, Jeffrey Connors.

Defendant argued at trial that although there may have been separate drug conspiracies, there was no RICO conspiracy, and he, in any event, acted individually. At the trial defendants' request, the Court in its charge, instructed the jury that if it found that the RICO conspiracy alleged in the indictment did not exist, it could not find the defendant guilty. The Court explained

4

that "[t]his is so even if you find that some conspiracy other than the one charged in this indictment existed, even though there may have been some overlap in membership." The jury rejected this argument, finding defendant guilty of the RICO conspiracy alleged in the indictment.

### III. MOTION FOR A NEW TRIAL

Prior to sentencing, defendant again moved for a new trial. Dkt. No. 526. In the present motion, defendant claims that he is entitled to a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, defendant contends that the government failed to: (1) disclose that Thompson and Jones were charged with "illegal cocaine distribution", Dkt. No. 526-3, p.2, in separate federal indictments in the Northern District of New York in 2005, *see United States v. Eric Thompson*, 5:05-CR-204 (FJS); *United States v. Raymond Jones*, 5:05-CR-10 (DNH); and (2) provide the documents and material supporting those cases, including evidence showing that Thompson, and Jones had a connection to the "clam shell trap" vehicle. Defendant argues that the government's failure to disclose this information prohibited defense counsel from cross-examining Pringle to show that Pringle and others were involved in a separate drug distribution conspiracy, not the RICO conspiracy alleged in the indictment, and that defendant sold marijuana and crack "as an individual unrelated to any others." Dkt. No. 526-3, p.5.

With regard to Thompson, defendant contends that the government failed to disclose that Thompson, and eight co-defendants, were charged with engaging in a conspiracy to distribute cocaine and cocaine base (crack). Further, according to defendant, the government did not inform the defense that Thompson was "arrested in a sting operation returning from NYC with almost 1 kg of cocaine in a vehicle having a clam shell trap." Dkt. No. 526-3, p. 3.

With regard to Jones, defendant states that the government failed to disclose that Jones was charged with two counts of knowingly and intentionally possessing with intent to distribute and distribute cocaine base (crack). Defendant also points out that a sentencing memorandum the government filed in that case indicated that Jones was more than a drug user at the time of arrest and was "a drug dealer" who "was involved in drug dealing on a larger scale or at least associated with large scale drug dealers because in March 2004 authorities seized approximately one kilo of cocaine from a vehicle registered to him that was driven by another individual at the time of the seizure." Dkt. No. 526-4, p.2. The sentencing memorandum also stated that Jones provided a gun to law enforcement in an attempt to help Pringle, who was facing local drug trafficking charges, and that Jones attempted to help Israel Applins, who was facing federal gun and drug charges. Finally, the sentencing memorandum indicated that Jones "tried to fight forfeiture of the vehicle even though the vehicle had a trap in it designed to hide drugs."

As an additional matter, based on all of the above, defendant "maintain[s] that there is more evidence in those two cases showing Pringle's involvement with those two indictments and respectfully request all of the material". Dkt. No. 530, p. 4.

After receiving defendant's motion, the government contacted the Assistant United States Attorney who handled the Thompson prosecution and obtained line sheets from the wiretap in that case. According to the government, the line sheets show the interception of thousands of calls, only a handful of which related to Pringle, and one of which relates to Jones. Indeed, the line sheets attached to the government's submissions contain approximately six calls involving Pringle. These calls contain discussions of where to meet and refer to windows that were broken

6

on Pringle's car.[2]  The reference to Raymond Jones, indicates that police surveilled a car with a broken window that was registered to Raymond Jones.[3]

The government states that although it "did not disclose every scrap of paper relating to other cases, it did in fact disclose the nature of the relationship between Pringle and Eric Thompson well in advance of trial".  Dkt. No. 529, p. 2.  The government further states that there is "simply no proof" that Jones was involved in a conspiracy different from the RICO conspiracy to which Pringle and Kelly pled guilty.  Dkt. No. 582, p. 2, n.1.

## IV.   DISCUSSION

To establish a *Brady* violation, "a defendant must show, *inter alia*, (1) that the government failed to disclose favorable evidence, and (2) that the evidence it 'suppressed' was material." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995).  "Evidence is favorable to the accused if it either tends to show that the accused is not guilty or if it impeaches a government witness." *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002).  "Evidence is material if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. " *United States v. Middlemiss*, 217 F.3d 112, 123 (2d Cir. 2000).

Even assuming that the government failed to disclose favorable evidence in this case, the government's suppression of evidence, "does not constitute a constitutional violation unless the evidence is 'material.'" *Gil*, 297 F.3d at 103.

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).

---

[2] There is no indication that this is the "clam shell trap" vehicle to which defendant refers.

[3] Defendant does not contend that the information in the line sheets was material.

7

> [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of trial.

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal citations and quotation marks omitted). "*Brady* requires the government to disclose material exculpatory evidence known to it but does not require the government to disclose all evidence in its possession that might assist defense preparation." *Middlemiss*, 217 F.3d at 123

At trial, Pringle testified that he owned two "clam shell vehicles" which he used to transfer large amounts of cash and cocaine back and forth from New York City.  Pringle also testified that he pooled his money and sold cocaine with Thompson, traveled to New York City with Thompson to purchase a kilo of cocaine, and sent others, including Kelly, Israel Applins, and Thompson to purchase cocaine on different occasions.  Moreover, Pringle's debriefing notes indicate that Pringle pooled his money and sold cocaine with Thompson, and that Thompson went to New York City to get the cocaine on defendant's behalf.  Defendant was aware of this information prior to trial and defense counsel cross-examined Pringle regarding his dealings with Thompson.  Since the jury was aware of the connection between these individuals, and that they traveled together to buy large quantities of cocaine, evidence that Thompson was indicted in a separate drug conspiracy and that he and Pringle used the same "clam shell vehicle" would not foster further illumination of an already clear relationship.

Likewise, evidence that Raymond Jones was charged with possessing crack in a separate indictment, associated with "large scale drug dealers", and connected to the "clam shell trap" vehicle, would not put in a different light the information defendant already possessed regarding

8

Pringle's relationship with Jones. Prior to trial, the government provided defendant with notes from Pringle's debriefing which stated that Jones was a family member, an "enforcer" to the gang, and that he "would collect on drug debts owed." Despite having information regarding Jones's involvement in the Elk Block gang drug trade, defense counsel did not address it at trial. Thus, although defendant may not have known that Jones had a connection to the "clam shell vehicle", or that he possessed crack on at least two occasions, he did know from Pringle's debriefing notes that Jones was associated with Pringle and the Elk Block gang, and that he was involved in the gang's drug trade.

In any event, none of this evidence, considered together, calls into question or sheds a different light on the overwhelming evidence of defendant's involvement in the RICO conspiracy charged in the indictment. Even if a separate conspiracy between Pringle, Thompson, and Jones existed, so long as the RICO conspiracy charged in the indictment also existed, the jury could find defendant guilty. *See United States v. Thompson*, 76 F.3d 442, 454 (2d Cir. 1996) ("even if multiple conspiracies are found, the jury should convict the defendant if it finds that one of the proven conspiracies is the one alleged in the indictment and that the defendant was a member of it.").

Here, the evidence regarding Thompson and Jones in no way detracts from or casts in a different light the evidence of defendant's involvement in the RICO conspiracy. As the Court stated in its decision denying defendant's first post trial motion, "having heard all the evidence presented at trial, the Court does not pause in concluding that, given the overwhelming evidence showing defendant Pierce's involvement in the Elk Block gang, presence at gang related activities, use of a firearm, and frequent engagement in drug sales in Elk Block territory," (Dkt. No. 489, p.23), there is no reasonable probability that the disclosure of evidence showing

9

Pringle's relationship and drug dealings with Thompson and Jones, and perhaps others, would have a resulted in a different outcome at trial.  Although the test for materiality "is not a sufficiency of evidence test," *Kyles*, 514 U.S. at 434, "[w]here the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *Gil*, 297 F.3d at 103.  Accordingly, defendant's motion for a new trial based on the government's failure to disclose *Brady* evidence, is denied.

Finally, defense counsel speculates that there must be more evidence from the Thompson and Jones cases that is relevant to the instant case and requests an order directing the government to produce any such evidence.  The Court declines to issue an order directing the government to produce evidence based on defense counsel's speculation that such evidence may exist.

### V.     CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that defendant Ismail Pierce's motion for a new trial is **DENIED** in its entirety, and it is further

**ORDERED** that defendant Ismail Pierce's sentencing is set for June 18, 2008, at 10:30 a.m., in Syracuse, New York.

**IT IS SO ORDERED.**

Date:  May 21, 2008

_____
Norman A. Mordue
Chief United States District Court Judge